**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JIMMY CATES**                                                          **PLAINTIFF**


**v.**                              **NO. 4:23-cv-00941-PSH**


**MARTIN O'MALLEY, Acting Commissioner**                  **DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER


Plaintiff Jimmy Cates ("Cates") challenges the denial of his application for disability insurance benefits. Cates does so on the ground that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Cates maintains that his residual functional capacity was erroneously assessed because the ALJ failed to properly evaluate the medical opinions of Cates' treating psychiatrist and failed to properly evaluate Cates' subjective complaints as he has difficulty standing and walking. Because substantial evidence on the record as a whole supports the ALJ's findings, his decision is affirmed.

---

[1]      The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

Cates was born on December 16, 1969, and was fifty years old on March 19, 2020, the amended alleged onset date. He alleged that he became disabled as a result of various mental and physical impairments.

In the ALJ's decision denying Cates' application, the ALJ summarized the evidence relevant to Cates' mental and physical impairments. See Transcript at 19-20, 21-25. There is no dispute as to the evidence relevant to those impairments, and the Court will not recite the evidence in great detail. Instead, the Court notes the following evidence in order to place Cates' assertions of error in context.

As to Cates' mental impairments, the record reflects that he has experienced symptoms associated with the impairments since well before the amended alleged onset date. The impairments include depression, anxiety, and post-traumatic stress disorder ("PTSD"). He has sought medical attention for his symptoms on a number of occasions, at least as far back as 2007, see Transcript at 2074, and has been treated with, inter alia, prescription medication.

For instance, Cates was seen prior to the amended alleged onset date by Dr. Lynnah Selman, M.D., ("Selman") and other medical professionals and/or interns at Arkansas Family Counseling. See Transcript at 840-854. Their progress notes reflect that Cates reported mental health problems

2

stemming from his time in prison, his poor health, conflicts in many of his close relationships, and job-related stressors caused by dishonest employees and financial struggles that eventually caused his business to close. He was prescribed medication that included alprazolam.

On May 8, 2019, or ten months before the amended alleged onset date, Cates saw Dr. Kevin Girtman, P.A., ("Girtman") for complaints of depression and anxiety. See Transcript at 1173-1179. Cates' history of present illness was recorded to be as follows:

> ... Started using drugs and alcohol. He stopped drugs since 2002 and stopped alcohol in 2011. Has always masked his symptoms in the past. History of childhood abuse. "I don't have any empathy." He states that he feels like he is two different people, a good guy, a bad guy. He does not sleep well. He uses sleep as an escape. His mother has mental illness. He reports that he hears voices. He states that his voices never tell him to hurt anyone however they do sometimes say things like "that bitch should be dead." The voices he hears are not his own. He has paranoia. He has all of his windows covered up to prevent people from looking in. Sleeps all the time. When he gets symptoms, his stomach may get upset and he may get headache. Denies suicidal thoughts or plans. He states that he works and goes home and sleeps. Now having problems with his marriage. "I don't enjoy life." When he eats out he won't sit with his back to the door. He has obsessive compulsive behaviors. Checks stove and doors over and over. He denies being a danger to himself or others. He verbalizes understanding of the importance of calling 911 or going to the ER if he develops suicidal or homicidal thoughts.

See Transcript at 1174. Cates was nervous and anxious, but a mental status examination was unremarkable as he was alert and had a normal mood and affect. A depression screening was performed, and he was assigned a PHQ-9 score of twenty-one.[2] His prescription medications at the time included alprazolam and trazodone.

Cates continued to see or speak with Selman and the other medical professionals and/or interns at Arkansas Family Counseling. See Transcript at 835-839, 841. For instance, Cates spoke with Selman on May 24, 2020. See Transcript at 839. Cates reported having heard voices most of his life, and he reported having had difficulties as a child. Selman intended to modify Cates' medication after he was seen by a cardiologist.

Cates spoke with Selman approximately two months later. See Transcript at 838. During that conversation, Cates reported that his symptoms were much improved as a result of his use of Zyprexa.

On July 13, 2022, Selman signed a note on Cates' behalf in connection with his application. In the note, Selman represented the following:

---

[2]     "The PHQ-9 is the nine item depression scale of the Patient Health Questionnaire. The PHQ-9 is a tool for assisting primary care clinicians in diagnosing depression as well as selecting and monitoring treatment." See Luckett v. Astrue, No. 09-5211, 2011 WL 336250, 3 (W.D. Ark. Jan. 31, 2011). A score above nineteen indicates severe depression. See Alia D. v. Kijakazi, No. 21-cv-366-MJD-LIB, 2022 WL 3718600 (D. Minn. July 27, 2022), report and recommendation adopted, No. 21-cv-366-MJD, 2022 WL 3717186 (D. Minn. Aug. 29, 2022).

... Cates is a 53 [year old] Caucasian man I had been seeing at Ark. Family Counseling in [North Little Rock] since 2007 for psychiatric issues involving primarily anxiety [and] depression. He has always been very pleasant, appropriate, and polite with me. However, apparently there have been instances in which he loses his temper with his wife and more frequently with employees. He had worked for some time to manage the production of a wildlife magazine. Recently, he learned that an employee who was in charge of payroll had in fact given herself a significant raise without any verification on his part. This made him very angry, and he threatened to "knock her in the head." As they were dealing with these issues, his PCP/cardiologist recommended that he would not be able to continue on the job since his anger has a detrimental effect on his physical health, i.e., his heart and diabetes [and] further recommended he apply for disability.

When COVID occurred, his office closed [and] he stayed home and he and his wife were in isolation. In visiting with [Cates], I became aware of more of the details of the psychiatric problems he had shared with the social workers he had seen in counseling sessions at [Arkansas Family Counsel]. In fact, many of his problems stem from childhood. His father left the family when he was 7 [years old] and his mother left when he was a little older the first time (she had drug [and] alcohol problems), and his grandmother took care of him [and] his sister. He began hearing auditory hallucinations at that time directing him to hurt others. He was taken to a variety of doctors and counselors for help but as time passed, he began to mature and the voices lessened. As an adult, he continued to have nightmares. When I learned of these nightmares and hallucinations, I added to my focus of treatment these issues and added medication to center on them. He has shown some responses to these [medication] changes and notes he has been able to watch TV [and] feel more comfortable.

He currently takes:     alprazolam ...
                        Trazodone ...
                        Zyprexa ...

Although [Cates] has shown improvement, due to the long standing course of his illness, it is recommended that he be [permanently] retired [and] be granted permanent [and] total disability with the following diagnoses: PTSD, anxiety disorder, and depressive disorder.

See Transcript at 2074-2075.

As a part of Cates' application, he saw Dr. Glen Adams, Psy.D., ("Adams") for a consultative mental status evaluation. See Transcript at 1326-1330. Cates reported, inter alia, that he was living with a woman, and they had been together for twenty years. He is capable of caring for himself, although there had been times when he neglected his self-care. As to the effects of Cates' mental impairments on his adaptive functioning, Adams opined the following:

How do mental impairments interfere with this person's day to day adaptive functioning?

[Cates] has a driver's license. He drives but not alone because his partner helps him manage the anxiety and he is somewhat dependent on her emotional support. He does his grocery shopping by ordering online and picking it up because he does not want to go into the store due to the anxiety.

Capacity to communicate and interact in a socially adequate manner?

In the interview, he was able [to] communicate easily and seemed to enjoy the interaction with the examiner.

Capacity to communicate in an intelligible manner?

The claimant was able to communicate in an intelligible manner without any obvious deficits.

Capacity to cope with the typical mental/cognitive demands of basis work-like tasks?

The claimant's cognitive skill was not impaired nor does it cause any difficulty in his ability to manage the demands of work like tasks.

Ability to attend and sustain concentration on basic tasks?

During the interview there was not any substantive indication of difficulty with attention, concentration or persistence to tasks. He reported that when he is away from a safe location and his anxiety is surging, then these features are impaired.

See Transcript at 1329-1330.

As to Cates' physical impairments that affect his ability to stand and walk, the record reflects that he has experienced problems associated with the impairments since before the amended alleged onset date. The impairments include coronary artery disease, supraventricular tachycardia, chronic obstructive pulmonary disease ("COPD"), a left knee anomaly, diabetes, and obesity. He has sought medical attention for his problems on a number of occasions. He has undergone procedures to isolate the problems and has been treated with medication.

For instance, Cates' complaints of chest pain, shortness of breath, and a racing heart led to testing that revealed mild mitral regurgitation, mild pulmonic insufficiency, and mild tricuspid regurgitation. See Transcript at 817. He eventually underwent a catheterization procedure with angiography on April 27, 2020. See Transcript at 346-386. The procedure revealed "[m]ild disease involving the mid left anterior descending coronary artery with evidence of branch vessel disease with probable significant stenosis of a small diagonal branch not necessarily amendable to intervention." See Transcript at 370. Continued medical therapy and risk factor modification were recommended, the latter including the admonition that he stop smoking cigarettes. His post-procedure evaluations were largely unremarkable. He did, though, continue to complain of shortness of breath, which was caused, at least in part, by his continued use of cigarettes. See, e.g., Transcript at 414-415.

On December 23, 2020, Cates underwent ablation of his "left accessory pathway into the lateral left atrium" as treatment for his erratic heart rhythms. See Transcript at 870. There were no post-procedure complications, and his subsequent evaluations were largely unremarkable. See, e.g., Transcript at 1369 (01/14/2021), 1363 (04/22/2021), 1358-1359 (07/30/2021), 1353-1354 (08/23/2021), 1830 (10/19/2021).

Cates also experienced pain in his left knee, pain that was caused by a cyst/vascular mass. See Transcript at 1963-1964, 1969. He nevertheless walked with a normal gait and had a good range of motion in his left knee. On January 31, 2022, he underwent a procedure to remove the cyst/mass. See Transcript at 2041-2045. His post-procedure evaluations were largely unremarkable. See, e.g., Transcript at 2057 (02/15/2022), 2060 (04/25/2022). He continued to walk with a normal gait and was encouraged to "gradually build up the habit of exercising daily." See Transcript at 2060.

The record contains a summary of Cates' work history. See Transcript at 231-248. The summary reflects that he has an inconsistent work history, having last worked as a telemarketer for a wildlife magazine.

Cates completed a series of reports as a part of his application. In a pain report, he represented, inter alia, that he experiences extreme fatigue and has difficulty standing and walking. See Transcript at 279-280. He estimated that he can stand/walk for about one minute before he begins to experience pain. In a function report, he represented, inter alia, that he is bedridden most of the day. See Transcript at 281-288. He has difficulty attending to his own personal care, cannot prepare his own meals, can do no house or yard work, and very seldom goes outside. He has difficulty handling stress and fears leaving his home.

Cates testified during the administrative hearing. <u>See</u> Transcript at 39-57. He is seventy-three inches tall and weighs 238 pounds, having a Body Mass Index of 31.4 or within the obese range. He stopped working in March of 2020 when his business ceased "[d]ue to COVID." <u>See</u> Transcript at 43. He received unemployment benefits after the business ceased but did so only until approximately November of 2020. When asked why he cannot work, he testified as follows:

> A. Well, you know, I've got—I've got diabetes, and I take Gabapentin for it. And my neuropathy in my feet, I can't stand very long. My feet go numb and I get cramps in my calves and my feet. And—and, of course, you know, I've got diabetes. My heart problem, my—my tachycardia, I take Carbatrol for it, 25 milligrams, because that's the strongest dose that they have. Carbatrol is something that keeps your heart from beating too fast. And I can't even take a shower without—whenever I get out of the shower where I've got to sit down and rest for 10 to 15 minutes, you know, until I get—get my breath back and get caught back up and my heart slow[s] back down. If I'm just sitting at idle, my heart, I run about 120 a minute as far as beats. But if I'm, you know, just taking a shower, it gets to the point where, I mean, I get out of the shower, I've got to sit on the end of the bed in front of a fan, you know, to get my—my heart slowed down, get my breath back.

> Q. Now, I want to be sure I'm—

> A. And then my mental health—

> Q. Go ahead.

A. And also my mental health issues with my anxiety and panic attacks, depression, and PTSD.

Q. How long have you had mental health problems?

A. My mother has taken [me to] the doctor since I've been about 12 years old. I've been back and forth, back and forth, back and forth.

Q. Well, it's fair to say you've had mental health problems your entire adult life?

A. Yes.

See Transcript at 45-46. Cates' mental impairments are the primary reasons he cannot work. His daily activities are extremely limited as he tires easily. He continues to smoke cigarettes but is down to only five cigarettes a day. He estimated that he can stand in one place for about ten to fifteen minutes and can walk for about ten minutes at one time.

The ALJ found at step two of the sequential evaluation process that Cates' severe impairments include coronary artery disease, supraventricular tachycardia, COPD, diabetes, left knee vascular anomaly with degenerative changes, depression, anxiety, PTSD, a personality disorder, and obesity. The ALJ assessed Cates' residual functional capacity and found that he is capable of performing a reduced range of light work. The work is reduced, in part, by his inability to no more than occasionally

climb, balance, stoop, kneel, crouch, and crawl, and by only being capable of performing "simple, repetitive work with simple work-related decisions." <u>See</u> Transcript at 21. The ALJ found Selman's medical opinions "not persuasive" because they are "poorly supported" and "conclusory as to 'total disability' without reference to functional limitations." <u>See</u> Transcript at 25. With regard to Selman's opinion as to the totally disabling nature of Cates' mental impairments, the ALJ found the following:

> ... the opinion as to totally disabling mental limitations is highly inconsistent with the actual mental status examinations in the treating record, the relatively conservative mental health treatment history, and claimant's highly skilled work history[,] overlapping with his mental health treatment[,] that ended only due to the COVID-19 pandemic.

<u>See</u> Transcript at 25. In making the assessment, the ALJ also considered Cates' subjective complaints in accordance with Social Security Ruling 16-3p. The ALJ found that Cates' allegations of "disabling limitations are not consistent with or supported by the overall record ..." <u>See</u> Transcript at 24. The ALJ found at step four that Cates is unable to perform his past relevant work, which the ALJ described as a "manager, telemarketing." <u>See</u> Transcript at 25. The ALJ found at step five, though, that there is other work Cates can perform.

Cates maintains that his residual functional capacity was erroneously assessed. He so maintains for two reasons. First, Cates maintains that the ALJ failed to properly evaluate Selman's medical opinions.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence, including the medical opinions. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007).

20 C.F.R. 404.1520c(a) provides that the ALJ will not give any specific weight to any medical opinion. See Phillips v. Saul, No. 1:19-cv-00034-BD, 2020 WL 3451519 (E.D. Ark. June 24, 2020). The ALJ will instead determine the persuasiveness of a medical opinion based on the following:

> [...] supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

See Id. at 2.

The question for the Court is whether substantial evidence on the record as a whole supports the ALJ's evaluation of Selman's medical opinions, specifically, the ALJ's finding that the opinions are "not persuasive." The Court finds, for the reasons that follow, that the ALJ could evaluate the opinions as he did.

First, the ALJ could and did properly find that Selman's medical opinions are "not persuasive" because they are "poorly supported" by her own progress notes. It is true that Cates has suffered from depression and anxiety and has experienced auditory hallucinations and nightmares. He has also experienced what he characterizes as angry outbursts. He has spent time in prison, his health is poor, and he has had conflicts in many of his close relationships. In addition, he has experienced job-related stressors, which eventually led to the closing of his business. Selman's notes reflect, though, that Cates' mental status improved over time with appropriate therapy and medication. For instance, on July 19, 2020, or four months after the amended alleged onset date, Selman spoke with Cates and noted the following:

> Talked [with] Tracy [and] Jimmy today on follow-up from when I prescribed new medication for him last month. He says he is much improved. Is able to sit comfortably for a while [and] is happy with the improvement. ...

See Transcript at 838. During a tele-medicine session approximately one month later, Cates reported that he was "very pleased" with how well he was responding to Zyprexa. See Transcript at 838. Although Cates' mental status continued to fluctuate, during a November 20, 2020, tele-medicine session with Selman, Cates again reported being pleased with the positive results he was experiencing with Zyprexa. As an example, Cates reported that he had not experienced any recent angry outbursts.

Selman's progress notes are also devoid of any mention of the functional limitations caused by Cates' mental impairments. Specifically, Selman offers no opinions as to what Cates can do despite his limitations. Selman merely represents that Cates should be granted permanent and total disability.

Second, the ALJ could and did properly find that Selman's medical opinions are "not persuasive" because they are inconsistent with the other evidence in the record. For instance, Selman's opinions are inconsistent with many of the progress notes prepared by other medical professionals at Arkansas Family Counseling. Those notes reflect that Cates' condition improved over time with appropriate therapy and medication. In a December 3, 2020, progress note, a Licensed Clinical Social Worker observed the following:

> Jimmy has not been to therapy since March. He has had financial struggles since he had to close his business due to the pandemic. He said his doctor suggested he get on disability due to his heart problems so he started that process. His condition is called supraventricular tachycardia and he has surgery Dec. 23 to find the problem spot in his heart. Jimmy said the new medications Dr. Selman prescribed him are helping tremendously. He said he is like a new man and his relationship with his wife is much better because of it.

See Transcript at 835.

Selman's medical opinions are inconsistent with one, or more, of the progress notes prepared by Girtman. The notes from those presentations reflect that Cates' mental status fluctuated. See, e.g., Transcript at 1180-1186 (05/14/2019), 1187-1199 (11/21/2019), 1200-1208 (02/24/2020), 1209-1216 (03/11/2020), 1217-1225 (03/17/2020), 1238-1247 (06/17/2020), 1253-1260 (11/30/2020), 1261-1268 (12/30/2020). It was good at times and poor at other times, the latter times being attributed to, inter alia, "stress at work, history of methamphetamine abuse, none since 2002, depression, and sleep disturbance." See Transcript at 1235. Even when Cates' mental status was poor, though, he routinely exhibited a normal appearance; was alert and oriented to person, place, and time; and had a normal mood and affect. His thought content was normal, as was his judgment. He was negative for self-injury and suicidal ideas.

Selman's medical opinions are inconsistent with the findings made by Adams, findings the ALJ found to be "generally persuasive." See Transcript at 25. Contrary to Selman's opinions, Adams found that Cates has moderate difficulties with attention, concentration, and focus in a work environment but otherwise has no more than mild limitations in the other functional areas, e.g., understanding, remembering, or applying information; interacting with others; and adapting or managing oneself.

Selman's medical opinions are also inconsistent with what the ALJ correctly characterized as the "relatively conservative mental health treatment history." Cates' mental impairments were treated with therapy and medication. There is no evidence that his impairments required hospitalization or other types of intensive, in-patient care.

Selman's medical opinions are inconsistent with Cates' ability to work despite his mental health problems. The record reflects that Cates worked until March of 2020, or the month of the amended alleged onset date. He testified that he stopped working, not because of his impairments, but because his business closed as a result of the pandemic. He received unemployment benefits for a period of time, which indicates an ability to work, but he stopped receiving the benefits in approximately November of 2020.

"It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the [ALJ's] decision if that decision is supported by good reason and is based on substantial evidence." <u>See</u> <u>Dillon v. Colvin</u>, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, the Court may not reverse the ALJ's decision merely because substantial evidence would have supported an opposite decision. <u>See</u> <u>Id</u>. Here, the ALJ could find as he did with respect to Selman's medical opinions as the ALJ's findings are supported by substantial evidence on the record as a whole.

Cates offers a second reason why his residual functional capacity was erroneously assessed. He maintains that his subjective complaints were not properly evaluated as he has difficulty standing and walking.

The ALJ is obligated to consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluate the intensity, persistence, and limiting effects of the pain or other symptoms. In evaluating the intensity, persistence, and limiting effects of the claimant's pain or other symptoms, the ALJ must consider all the evidence in the record, including evidence of the following factors:

(1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms ...; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p. See also Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

Having reviewed the record, the Court finds that the ALJ did not err in evaluating Cates' subjective complaints relevant to his difficulties standing and walking. The Court so finds for the following reasons.

First, the ALJ could and did find that Cates has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms with standing and walking. Specifically, as the ALJ found, Cates suffers from severe impairments that include coronary artery disease, supraventricular tachycardia, COPD, diabetes, left knee vascular anomaly with degenerative changes, and obesity. The Court is satisfied that the ALJ adequately evaluated the medical evidence relevant to those impairments.

19

Second, the Court finds that the ALJ adequately evaluated the evidence relevant to the intensity, persistence, and limiting effects of Cates' impairments that impact his ability to stand and walk. For instance, the ALJ noted Cates' daily activities; the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate the symptoms; and the type, dosage, effectiveness, and side effects of the medication he has taken, or takes, to address his breathing problems. <u>See</u> Transcript at 19-20, 21-23.

The ALJ could and did also note other relevant factors. The ALJ noted that Cates continues to smoke cigarettes, although he has "substantially reduced his habit." <u>See</u> Transcript at 22. The ALJ additionally noted that Cates "indicated that it was the COVID pandemic that forced him to close his business with five employees, after which he drew unemployment." <u>See</u> Transcript at 24.

The question for the ALJ was not whether Cates has pain caused by his impairments but the extent to which they impact the most he can do. The ALJ incorporated limitations for the impairments into the assessment of Cates's residual functional capacity but not to the extent he believes is warranted. The ALJ could find as he did, though, because substantial evidence on the record as a whole supports his evaluation of the evidence.

For these reasons, the Court finds that the ALJ's findings are supported by substantial evidence on the record as a whole. Cates' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 11th day of April, 2024.


_____
UNITED STATES MAGISTRATE JUDGE